UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 23-cr-10127-LTS |
| v. | |
| NICOLAS DAVILA, | |
| Defendant | |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The government submits this memorandum in support of its recommendation for **57 months of incarceration** for the Defendant, followed by three years of supervised release. This recommendation reflects the seriousness of the offense, and the need for deterrence and just punishment for this type of coordinated and theft.  The Defendant and his coconspirators targeted businesses and hardworking residents, upending their lives for days and weeks, stealing from them, rendering their cars and trucks entirely useless, and forcing them to incur thousands of dollars in deductible and repair costs.  A sentence of 57 months fully accords with the sentencing factors under Section 3553(a).

**THE ADVISORY SENTENCING GUIDELINES & PSR[1]**

**A.  Offense Level**

The government disagrees with the offense level calculation provided by Probation, which calculated the offense level in the final Presentence Report to be 17 (PSR ¶¶250-274).  The government lodged specific objections to Probation failing to find the 2-point increase for sophisticated means under

---

[1] The government refers to the United State Probation Office as "Probation", the Presentence Report by page (PSR p. _), or paragraph (PSR ¶_), and references to the docket are by entry number (ECF #_).  In addition to the content of the PSR, the government submits a report concerning the recent catalytic converter theft activity as Exhibit 1. The victim impact information is summarized from the Victim Questionnaire Spreadsheet is attached as Exhibit 2, and is referenced by the stated Victim number in the spreadsheet (Victim #_).  Additional victim impact statements are filed with the Court in redacted form as Exhibit 3,4, and 5. The complete victim list was also submitted to Probation and forwarded to the Court in spreadsheet form. The document specifies the date, victim, make/model of vehicle and other details of the thefts (FINAL VICTIM SPREADSHEET – 2023.10.25), and is a basis from which the Court can consider the pattern of repeated targeting of certain businesses, locations, makes and models.

USSG § 2B1.1(b)(10)(C), and the 2-point increase for possession of a dangerous weapon under USSG § 2B1.1(b)(16)(B).[2]  The government's substantive arguments regarding its objections to the PSR are set forth in the addendum to the PSR and in a separate filing, which the government will not repeat in this memorandum.

Consequently, the government takes the position that the Adjusted Offense Level for Group One *should be 24*. Compare ECF #1-6 (Plea Agreement).  Then, following the application of the grouping principals which add +1 to the offense level (PSR ¶¶266-269) (OL 25), and then acceptance of responsibility that reduces the offense level by 3, the Total Offense Level should be 22 (PSR ¶¶270-273).  With an unobjected-to criminal history score of two, the Defendant's criminal history category is II (PSR ¶¶275-280).[3]

### B.  Guidelines Sentence Range ("GSR")

Under the government's offense level calculation of 22 (as amended from the plea agreement), and CHC II, the government believes the GSR should be 46-57 months.

The PSR states that the GSR is 27 to 33 months (PSR ¶317), and the government objects to this as internally inconsistent.  Specifically, in addition to the substantive issues that the government raised with

---

[2] Upon further review of relevant caselaw relating to earlier versions of the enhancement under the USSG, the government no longer takes the position (as it did in the plea agreement) that the offense level should be increased by 2 because the case involved receiving stolen property, and the Defendant was in the business of stolen property.  See United States v. Kimbrew, 406 F.3d 1149, 1153 (9th Cir.2005) ("[N]early every circuit that has addressed the meaning of this enhancement has agreed that a thief who sells goods that he himself has stolen is not in the business of receiving and selling stolen property." (internal quotation marks omitted)); United States v. Saunders, 318 F.3d 1257, 1267 (11th Cir.2003) (finding that a prerequisite to the application of a similar enhancement under U.S.S.G. § 2B6.1(b)(2) "is that the defendant personally received and sold stolen property"); United States v. McMinn, 103 F.3d 216, 222 (1st Cir.1997) ("[A] thief would not qualify for the ITB enhancement if the only goods he distributed were those which he had stolen."); United States v. Sutton, 77 F.3d 91, 94 (5th Cir.1996) ("[O]ur approach views the [ITB E]nhancement as a punishment for fences, people who buy and sell stolen goods, thereby encouraging others to steal, as opposed to thieves who merely sell the goods which they have stolen.").

[3] Probation made an error of addition in the criminal history, which does not affect the criminal history category. Probation determined that the criminal history score is two in ¶¶276-279, but noted that there were three criminal history points in ¶280. This error does not result in a change to the guidelines sentence range.

the Offense Level calculation, Probation made an error in subtraction. Under Probation's calculation of the Combined Adjusted Offense Level is 21 (PSR ¶¶251-269). Probation then erroneously reduced the offense level by 4 for acceptance of responsibility and determined the Total Offense Level to be 17 (subtracting four as opposed to three offense levels) (PSR ¶¶270-273).

Even under Probation's calculation, the Total Offense Level should be 18, not 17. Absent this obvious math error, the actual GSR under Probation's offense level calculation should 30 to 37 months (OL 18, CHC II) -- as opposed to the GSR of 27 to 33 months (OL 17, CHC II) stated in ¶317.

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. See 18 U.S.C. ' 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 60 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A.    Nature and Circumstances of the Conspiracy and Thefts

The Department of Justice prioritized the investigation and prosecution of catalytic converter thefts due to the rising number of thefts across the country.[4] Those cases essentially involved targeting the businesses profiting from the purchase of stolen converters from the thieves and sale of the "cores" to other entities. Unlike those other prosecutions, however, Operation Cut & Run investigated the actual thefts,

---

[4] See Department of Justice, Press Release, "Justice Department Announces Takedown of Nationwide Catalytic Converter Theft Ring," November 2, 2022, available at https://www.justice.gov/opa/pr/justice-department-announces-takedown-nationwide-catalytic-converter-theft-ring (press release related to prosecution of DG Auto and related defendants in the Eastern District of California, and Northern District of Oklahoma).

identified the suspects and sought to hold them accountable for the specific thefts that they committed. In so doing, this case is somewhat unique in that the actual thefts were proven and the specific victims' impact would therefore directly factor into the Court's decision making at sentencing.  In short, this entire investigation was predicated upon targeting those who were doing themselves most harm to businesses and residents, and holding them accountable for the frustration, stress and financial costs they imposed on the lives of others.[5]

To be sure, thefts from about 500 vehicles that were specifically charged against this conspiracy. However, the Indictment only specified thefts that were supported by at least three salient pieces of evidence tying the thefts to these Defendants, such as: the MAROON ACURA MDX being visible on at least one theft in the area that night; cell site location information showing the Defendants operating in the general area that night; and some form of digital evidence corroborating the activity, such as a note, or text message. Many more were suspected and not able to be sufficiently proven.  Even so, this case and the very large number of actual thefts charged against the actual thieves is unique in the country.

### 1.  Sophisticated Nature & Repetitive Conduct

The government wishes to be clear: this is no mere property crime. For well over a year, this conspiracy stole hundreds of catalytic converters and made hundreds of thousands of dollars. The crimes demonstrated a honed precision in their execution and expertise in their planning and concealment. These were not crimes of opportunity or desperation, and they were not crimes committed by those who were down on their luck or suffering from some other issue. Far from it – these crimes were the product of concerted effort, discernment, expertise and an overarching goal of seeking as much as profit as possible.

The Defendants targeted vehicles along carefully mapped routes and used tools and implements purchased purposefully for the crimes. They researched the most valuable vehicles to target and spent effort doing "homework" to identify where they would be found. The crimes were committed brazenly. They

---

[5] And in so doing, this case revealed that the same large-scale buyers targeted in other prosecutions for the business were profiting from these Defendants actual thefts as well.

could steal from dozens of vehicles in a single night, systemically striking each truck or van parked at a business, or brazenly entering onto a driveway or parking lot to target a resident's personal vehicle parked outside.  For each victim, the Defendants plainly did not care how their slight profit from each vehicle would affect the business or individual. And they did not fear law enforcement. They knew that this was a "property" crime, and they had taken care to conceal themselves and not leave a discernible trail that could tie them to the Maroon ACURA MDX. And all they had to do was increase their speed on the highway and any chases would be terminated.

The thieves were skilled and well-prepared. The catalytic converter thefts were predicated upon the use of an internet application that provided real-time pricing for catalytic converters quantifying the commodity prices of the amounts of precious metal in a particular vehicle's converter. See PSR ¶¶17-18. Equipped with special knowledge of the values on the black market and technical skill with vehicles, the suspects targeted specific makes and models of vehicles to maximize the profits. PSR ¶¶17-18. They devoted time and energy to locate places and businesses where large numbers of these vehicles were located in order obtain an economy of scale. The thieves would travel hundreds of miles, hours on end in a single night, to specifically target businesses whose fleets were comprised of highly-valued vehicles. As R. DAVILA boasted to N. DAVILA in text messages, they would each be making $4,000 per night, despite the market prices for the precious materials being lower than they were previously.

The conspirators used a specific vehicle well-suited to the job, equipped with anonymous license plates that they believed would not provide an avenue of investigation for law enforcement. They disabled cellular phones and travelled hundreds of miles on most trips in order to spread their crimes across the state and region.  Their tools had sharp blades and fresh batteries. These tools and implements were deployed with skill and the cutter got underneath the vehicle with the reciprocating saw within second. For most thefts, it would take less than a minute to remove the converter from the vehicle and move on. They undertook high speed chases to avoid being caught by responding police, if they were seen. And in general, they operated with a sense of impunity that was born of an extremely successful system that had resulted in hundreds of thefts and hundreds of thousands of dollars in profit for the thieves.

Crimes of this caliber and sophistication committed by dedicated and professional thieves do not merit leniency or reduced sentences. The circumstances of these crimes support and aggravation of the offense, and do not, in the government's estimation, afford for much mitigation on the part of the skilled offender. These are not crimes born of necessity, desperation, or addiction. Rather, they are the product of concerted effort, discipline, considered investment of time and energy, and the application of technical skill. Indeed, the crimes are truly exacerbated by the cool precision that was employed in their commission over the many months, night after night, vehicle after vehicle, despite law enforcement's best efforts to stop them.

The nature and circumstances of these crimes prove the deliberate and considered choice to target and victimize others for personal gain. Because of the thefts, a business would suffer their entire fleet of vans being looted in one night, only to have other vehicles at a different location targeted on a later night. The individual victims were left with little recourse except to cobble together enough money to pay the costs to repair and rebuild what was left of their day and week after the inconvenience of losing their vehicle for the foreseeable future. The Defendant chose to target others and steal from other hardworking members of the community. The thieves made this choice instead of themselves working in a legitimate business or industry and applying their obvious skill and discipline to any sort of positive endeavor. The reason for this choice was obvious: the thousands of dollars in tax-free profits they would make each night. As a result, the nature and circumstances of the thefts require a serious sentence consistent with the government's recommendation.

### 2. Victim Impact

There are over 300 separate victims in this case. The victims include businesses and individuals from all walks of life and all parts of Massachusetts and some from New Hampshire. They included a food pantry, families, automotive businesses, tradesmen, a bakery, single parents, a home healthcare provider, and the elderly. The conspirators would target your vehicle, steal its converter, and you would have to deal with the vehicle being disabled for potentially weeks on end.

While it may not seem so, this case proves that catalytic converter theft is a profoundly personal

crime, even for the businesses who were targeted. The thieves would target a vehicle that is parked in a driveway of a home or parking lot of business. They would need to trespass to gain access to the car, get under it and can cut away the converter in seconds. For individuals, there is a significant sense of violation in the theft since their vehicle is parked close to where they were sleeping the night.  A number of victims have provided specific information to inform the Court about how the loss of their vehicles upended their lives and affected them financially.  Businesses suffered as well. They would see their trucks or vans disabled for weeks on end and then be forced to bear out of pocket costs for repairs and rental vehicles. But that is only their bottom line – the good will of the businesses also deteriorated due to these crimes: their customers would be left waiting for deliveries or service calls that could not be made, and workers were forced to make do with their own vehicles or do the work when other trucks were available.

For some businesses, who were targeted on multiple nights, these crimes also created a sense of impending disaster that they felt in addition to the financial losses. This Court should consider the fear and foreboding that invaded the minds of the business owner or operations manager, who knows that it is only a matter of time before the thefts and disabling of their trucks forced them to endure another round of a multi-week repair cycle and thousands of dollars in costs.[6]  One bakery was targeted on five separate nights at three of its locations and suffered damage to forty-two (42) of its trucks over the year.

For the individual victims, the impact is readily identifiable and understandable; consider how your life would be affected if in the moments you went to use your car in the morning you learned it was damaged and would be unavailable for few weeks. The simple act of going to work and getting you and your family ready for that day is completely frustrated.  Then consider: the loss of your vehicle for weeks, the stress that it creates in getting things accomplished and meeting obligations both personal and professional, the time that these problems take from you while the vehicle is out for repairs, and the unnecessary costs you have to bear, after already playing by the rules of society in every other respect. In stark contrast to their

---

[6] Nicolas Davila participated in two of those nights where the bakery was targeted, November 24, 2022, and November 27, 2022. On those two evenings, fourteen trucks were targeted.

victims, these Defendant have essentially never played by the rules.

The victim statements expressing these sentiments are be summarized as follows:

- A "medical/life sciences supply company" in Canton, MA reported being targeted on two nights for five vehicles, and suffering $12,114 in costs. See Victim #1.  They lost the use of their vehicles for over 60 days collectively, but were able to use other vehicles to perform all the deliveries. This victim reported: it is a "small minority owned company" that is operating in a crowded industry and as such we run on very slim margins." See Exhibit 3. The victim reports:

    From a processing standpoint, at that particular time we were fortunate enough to have enough vehicles to cover deliveries, so impact to us serving our customers was minimal. We did, however, have to take a hit financially to the amount of $12k to offset the cost of repair that insurance didn't cover.

    Not only did this theft have an impact on our bottom line, it also took a bit of a toll on us psychologically. Our trucks were locked up in an area of the property that was lighted, fenced in with barbed wire. This did not deter the thieves from coming in and cutting our vehicle's exhausts into pieces. We shared the video of both events with the Canton police. Basically, we felt helpless!!!! Every Monday I would dread coming into the office and having a driver tell me, 'we got hit again'.

Exhibit 3.

- One individual reported that they "had to share cars with [their] Fiance and there were several days I was unable to drive to work because of schedule conflicts." See Victim #2.

- An automotive business reported that their customer's truck was targeted, and their business was impacted, and the "theft forced [the business] to reevaluate our policy of leaving our customers vehicles outside our gate" and "[p]revent[ed them] from accommodating our customers['] requests" in the future; insurance paid the repair claim, which was nearly $8,000. See Victim #3.

- A paving business was forced to pay $8,60 to repair costs, but was otherwise unaffected because the truck was a rental. See Victim #4.

- A sheet metal business reported having to pay over $2,500 in a deductible, lost access to its truck for over two weeks, and lost about $10,000 in productivity.  See Victim #5.  The loss of their truck forced their work to be completed on overtime, and made them unable to prepare for future job deliveries.

- Another business had to pay $1,000 in a deductible, off the $7,428 repair claim, and lost the use of their van for two months. See Victim #7.  During this period, the employees had to use their personal vehicles to get to the job sites.

- A food service business was forced to pay $8,200 in repair costs, and lost use of their truck for 21 days during repairs.  See Victim #8.

- A soil company had to pay $3,101 and lost use of their van for over three weeks during repairs. See Victim #9. They reported about 5 to 10 hours in lost time as they dealt with the theft.

- One individual had to pay $798 to repair their Corolla, and lost use of their car for 26 days. See Victim #11. During that time, they had to pay about $5,000 in costs associated with getting groceries and suffered a $96 increase to their insurance premium.

- A kitchen business reported $5,648 in costs to repair their truck, and lost two days of productivity, and three delivery days that they were able to reschedule. See Victim #12.

- A financial service business reported $1,943 in costs to repair the vehicle, and while they did not experience any loss of business or wages, the "theft did affect [them] emotionally." See Victim #13.

- A food pantry was targeted twice and had to pay $2,318 in costs to repair, and lost access to their truck on eight days on each occasion. See Victim #14. The organization has one truck that helps them distribute assistance to 4,351 persons in 2023. The food pantry provided the following information in its victim statement (Exhibit 4):

  > Last year 695,704 pounds of food was distributed to our neighbors at these locations.

  > Another 38,713 pounds of food was sent home with children in partnership with our public school system to ensure that they had food over weekends.

  > Our food rescue program in partnership with Stop & Shop, Shaws, Whole Foods Market and B.J. 's allowed the pantry to collect 215,904 pounds of food, a critical resource we rely on to meet the needs of our neighbors.

  > All these programs were in jeopardy. But thanks to business owners in the community who provided us with use of their trucks when our truck was being repaired, we were able to conduct business as usual and are eternally grateful for their support.

  > Although our insurance company covered a majority of the costs, the out of pocket dollars were $2,318. Our organization raises money through donations, fundraisers as well as grants. We were very grateful to the donations we received to help cover the shortfall.

  > The food pantry is a volunteer based organization, and when word of the theft spread, many were brought to tears and outraged that someone could do this. After the 2nd theft, anger at this being done, not only to the food pantry, but to our neighbors in need, could not be measured. Our truck is a symbol of hope to -residents who are food insecure. We, as a community, felt violated in a way that cannot be quantified. To this day, we are still emotionally impacted by this crime, and wonder how individuals could be so callous as to impact our most vulnerable seniors, families and children.

Exhibit 4.

- One individual from Fitchburg reported being targeted twice, and had to pay a $300 for each claim. See Victim #15. The victim had to use two tows under AAA, and lost access to the vehicle for five days. They suffered the loss of two days of pay, and increases to their insurance premiums. The victim noted the intrusive nature of the theft: "Car was parked in my own driveway at the time" and reported a sense of helplessness from suffering the crime twice, stating that "this is happening so much, not just in my area but everywhere. There needs to be something done to prevent someone from stealing" the converters.

- Another victim in Worcester, MA, had to pay a $1,000 deductible and lost access to their car for two weeks. See Victim #17.  They also had to pay for a rental car that cost them $120.

- Another victim in Abington, MA, suffered about $500 in costs due to the deductible, the tow, and gas. See Victim #18. They also lost use of their truck for over a week, had to use a vacation day, and the truck was not repaired to original condition.  This victim is a "solo parent without a car" and "had to ask for rides to work and then borrowed a car" which was much less fuel efficient that added to the costs.

- An insulation business reported having to pay a $1,000 deductible for each of the two trucks that were targeted, and then bore labor and repair costs of $1,200. See Victim 19. That business also had to wait 30 days for their insurance company to pay the claims and by the time the money to repair was received, they lost a few months of use of the trucks.  The business reported that their "[t]wo trucks could not provide services to customers. Jobs were delayed. Workers had no work. Lost income because we could not preform work for clients."  The owners reported stress that was caused because they could go out and get their work done, and they wasted time replacing and repairing the vehicles, and noted the lost revenue and lost wages and work for their employees.

- An electrical company reported having to pay a $1,000 deductible and losing access to their truck for six days.  See Victim #20. They lost use of the "box truck used to deliver material/stock/tools to job sites" which "caused shipment delays, lost time, and delays to job schedules."

- An individual from Framingham, MA, reported that they had to pay a $500 deductible, but was able to get the repairs completed the same down. See Victim #21. The victim only had to lose a morning of work, but it was a "total inconvenience" because they work for an "hourly wage." The victim did note that it caused them "much stress and anxiety" regarding the "safety" of their family at home, and caused them to spend another $500 in a quality security camera system.

- A home health care company reported having to pay about $6,000 in costs for rental vehicles. See Victim #22.

- An individual from Framingham, MA reported that they paid a $500 deductible of a $3,000 claim, and lost their vehicle for about a week of repairs. See Victim #23.  The victim also "[l]ost a day of work because of dealing with insurance, car rental, AAA, and repair shop."

- A victim from Shrewsbury, MA, reported that they paid $2,318 in costs, and lost a day of work and their son did not go to school. See Victim #24.  This victim also reported that they suffered a "very strong financial and psychological shock from which I still cannot recover." Specifically, the victim had "great difficulty" in purchasing a car, and then about "two months later I had to pay another half of [the] cost of this car for repairs."

- A kitchen design company reported that they paid a $500 deductible and lost use of their truck for about 9 days. See Victim #25.  The business reported that "Each business day without a truck cost my company approximately $1000 per day related to lost business opportunities (product deliveries)." Aside from the business's bottom line, this also affected their customers as well. As the victim reported: "Each business day without a truck resulted in customers complaining that we could not deliver their materials. (We delivery critical building materials to homes undergoing kitchen renovations-delivery delays mean customers are without working

kitchens.)"

- A sports company suffered $500 costs for the deductible off a total repair claim of $6,500. See Victim 26. They lost the use of the work van for over a month during repairs, and this negatively affected their marketing because the van carries the business information on it.

- An individual in Abington, MA reported that they paid a $500 deductible off a $1,784 repair bill. See Victim #28. They lost the use of the vehicle for repairs, and lost about one and a half-days of work because they were unable to work without their vehicle.  This victim commented on the nature of the intrusion and believed "the theft was well planned and executed. The parking spaces are directly in front of our townhomes."

- An individual in Easthampton, MA reported having to pay a $1,000 deductible and $281 for a tow. See Victim #30. The victim lost the use of their car for three weeks and rented a car for a week. The victim is "disabled and it really put me off the edge. I was so upset, I couldn't go up and babysit my grandkids in Russell.so that I was really put out on that."

- A business in the construction company who had seven vehicles targeted reported that they spent over $7,770 on temporary fixes to their trucks and anti-theft devices.  As that business reported:

  The theft of the catalytic converters on 7 of our vehicles left us with the inability to utilize these 7 trucks and placed a significant strain on the remainder of our fleet, drivers, and warehouse staff. We value our commitment of Next Day delivery to our customers and this theft hindered our ability to meet our commitments.

  Due to the rampant theft of catalytic converters in our region; we were unable to source new parts for some time and were left with no option but to place temporary fixes on these trucks. We contracted with a local welder who was able to install a temporary fix so that we could get these trucks back on the road. This temporary repair took 5 days to complete on these trucks which again; significantly hindered our ability to deliver product to our customers. This temporary fix alone cost us $2,200.00.

  Although the cost of replacements and repairs is significant, the impact that actions had on our staff was far greater. The stresses of having to reschedule deliveries, move deliveries to other available vehicles, and all whilst ensuring our customers receive the same level of service that they would receive on any other given day. Our day to day is fast-paced yet extremely efficient and the stress of having our fleet impacted in this manner is one that we hope to never have to deal with again. To ensure that we do not have to face this ordeal in the future, we took the extreme measure of placing anti-theft devices in all of our fleet vehicles. The cost associated with these anti-theft devices was over $5500, in 2022. And this is something we continue to add to any new fleet vehicle we purchase.

  As stated above, the actions of had a great impact on our business. We incurred financial and delivery burdens as well as stress amongst our staff. And I can assure you that our Automobile policy premiums have been significantly impacted as well due to this incident. [The Defendants] should be held accountable for the crimes he has committed and our region should be able to feel safe against this happening again in the future.

Exhibit 5.

The nature of these crimes targeted others and had serious impacts on the victims' lives. While the impact is not measured in physical injuries, there were emotional injuries, practical difficulties, frustration and stress that the crimes imposed, and also the very significant financial setbacks that the victims suffered. There is a measure of just punishment that must be reflected in the sentence when, as here, the Defendants target others and steal time and peace of mind from the lives of so many. The government asks the Court to impose the requested 57 months, which properly reflects the Defendant's role and participation in stealing from others, negatively affecting the lives of dozens of individuals and businesses financially and emotionally, and profiting in the process.

### 3. Statistical Impact Following Arrests

The impact of the investigation and dismantling of this theft crew also cannot be overstated. And it should be directly considered by this Court in terms of the nature and circumstances of crime. Since the day of the coordinated takedown and arrests on April 12, 2023 to date of the filing of this memorandum, there have been only seven (7) catalytic converter thefts reported to Mass Crime Net.[7] See Exhibit 1. By comparison, during the period of July 2022, through April 12, 2023, there were 258 catalytic converter theft incidents (each mostly comprised of multiple thefts) reported to Mass Crime Net and NESPIN. The substance of this exhibit is also born out by the dearth of media reports of catalytic converter thefts in Massachusetts since then as well.

While this conspiracy was not responsible for every catalytic converter theft reported to Mass Crime Net during the period of July 2022, through April 12, 2023, the nearly complete cessation of catalytic converter theft in Massachusetts speaks to how prolific these conspirators were, and how this conspiracy did in fact drive those numbers. This reduction also speaks to the success shared by the over-70 local police departments in Massachusetts and New Hampshire, Massachusetts State Police and FBI in turning the tide

---

[7] Mass Crime Net is an information sharing platform hosted by the Massachusetts State Police. In this investigation, Mass Crime Net served as a coordinating entity and clearing house for catalytic converter theft incidents throughout the region. Apart from this investigation, Mass Crime Net receives reports of property crime and other incidents of regional note in order to facilitate information sharing, coordination among agencies, and promote officer awareness and public safety.

of these thefts. In short, Massachusetts is no longer open for business to catalytic converter thieves, and the residents and businesses of this state simply do not need to fear the theft of their catalytic converters.

These Defendants were essentially professional catalytic converter thieves, with a dedicated fence and ready access to the larger marketplace. The removal of these five cutters, and their dedicated fence, the aggressive prosecution by other components of DOJ of national entities responsible for buying stolen converters up the chain, and the passage of recent legislation in Massachusetts, have all combined to essentially end catalytic converter theft in the state of Massachusetts. This astonishing statistical drop-off should give this Court insight into the nature and circumstances of the organized and sophisticated conspiracy, and how the crimes that they committed play into the larger landscape of catalytic converter thefts in the area. In short, these charged Defendants played an outsized role in this entire category of crime.

The government suggests that a sentence of 57 months -- nearly 6 years -- sends a very serious and appropriate deterrent message that: participation in a conspiracy of this nature for even a limited period will merit a lengthy sentence, and that stealing from others on this scale will not be tolerated and will be met by a sentence that will separate you from society for considerable period of time. This is type of general deterrent message is all the more important for this Defendant who has a criminal record, carried firearms and dealt drugs during the same time period.

### B.    Thefts Committed by this Defendant

This Defendant, Nicolas Davila is responsible for catalytic converter thefts taking place between November 2022 and December 2023. See PSR ¶¶72a-75a. These nights of theft account for 42 vehicles. See PSR ¶238. The Defendant committed all of these thefts with his brother, Rafael DAVILA.

Their text messages reveal the close connection and details that were shared. In short, rather than work a legitimate job, which it appears the Defendant rarely has ever done (PSR 309-311), these offenses were driven by greed, and the accumulation of multiple thousands of dollars from a single of theft. In late November 2022, after the first night of thefts together, text messages reveal their discussions about monetizing the stolen converters and plans for the future thefts:

R. DAVILA:              Yes. I dropped some pieces off to the dude, he said he can only buy like $5k worth at a time. When I got there he said I could've brought more 🤷

So I'm gonna bring more to him tonight and he said he'll have money for them tomorrow evening.

So I dropped off the whole first round. If everything goes good we'll have the money tomorrow evening. hopefully my plates land on time and we'll work again on Wednesday

N. DAVILA:              Did goldy tax you ? Lol

R. DAVILA:              He still in the mix making his cut

This is were we are so far more or less. Just waiting on prices for those last two torpedos

Which are the two more expensive ones so not a bad night

After we check this last town out we gonna do something different so like starting all over again. My next group should give us a good 4-6 months of work twice a week.

The guy is gonna be here at 9 to pick up saturdays load so we should get paid buy tomorrow night then I'll send yesterdays load

The profits were significant. In one text message, R. DAVILA reported that even with the precious metals market down that they were making $4,000 in one night.

R. DAVILA:              Yea definitely even with market down that gonna be a $4k night each not fuckin bad

With all this profit, from even a few nights of theft, they discussed Nicolas DAVILA utilizing some of the proceeds to buy a vehicle.  R. DAVILA suggested that he wait only a few weeks, and then he would have made so much money that he would be able to afford a far nicer car:

R. DAVILA:              I would just hold off for a month or so and let the money start pouring in then options will start to change

You got this just be patient a few weeks and your going start looking at a whole other level of cars

Of course, the catalytic converter thefts were not all that was at issue for this Defendant. During the search of his the Defendant's residence, investigators located tools and implements used in the thefts,

and cocaine and a firearm.  As Exhibit 6 makes clear, the cocaine and firearm recovered from the residence were the Defendant's. Exhibit 6 is the affidavit supporting search warrant applications for three of the Defendant's phones.

In the Defendant's phones, investigators observed images of NICOLAS DAVILA discussing the distribution of drugs, holding firearms, and posing with proceeds.  Some insight into the Defendant's thought processes can be discerned as he fans out proceeds from his crimes, and positions firearms dramatically on the floor. Indeed, one of the firearms appears consistent with the weapon utilized in the December 31, 2022, murder that the Defendant is charged with committing.[8]  Examples follow below.



IMG_2865.heic; metadata showing 12/26/2022; firearm appears consistent with a Springfield XD9 SC Mod 2 firearm

---

[8] Investigators also observed images of what appears to be a Springfield XD9 SC Mod 2 firearm, consistent with the make and model of the reported murder weapon in the pending murder indictment. The image of the Springfield XD9 SC Mod 2 firearm bears metadata showing creation dates from prior to the December 31, 2022, date of the murder.



IMG_2863.HEIC  12/26/2022 10:18:01 AM



IMG_7087.heic; metadata showing 7/20/2022; firearm appears
consistent with a Springfield XD9 SC Mod 2 firearm



IMG_2868.hric; metadata showing 12/26/2022;
firearm appears consistent with a Springfield XD9 SC Mod 2 firearm



From all of this, including the Defendant's opportunistic approach toward drug and property crime, the Court can gather a sense of context and the basis for the government's recommendation. The Defendant participated in approximately 10% of the entire conspiracy's converter thefts, and profited extensively.  He wielded firearms, and dealt drugs when he was not stealing from others.   Overall, the nature and circumstances of the Defendant's crimes merit a sentence of 57 months.

### C.    Criminal History, Specific Deterrence, Just Punishment

To be sure, the Defendant's history of convictions does not drive this sentence. The Defendant is only category II, with two criminal history points. However, despite being 26 years old, the Defendant has serious a record of arrests and adjudications. He is no stranger to the criminal justice system and his offenses have quickly escalated from very serious domestic violence incidents to murder in a few short years.

To start, the Defendant admitted to sufficient facts for juvenile charges where he strangled his girlfriend at age 17, and his mother had to intervene to get him to release the girlfriend's neck (PSR ¶275). Once he let go of her throat, the victim was on the ground and the Defendant kicked her in the face (due to its age, this incident does not score) (PSR ¶275).

Shortly after that incident, the Defendant resisted arrest and ran from police and engaged in a struggle at the front door of his home (PSR ¶276) – as before, this incident does not score. The Defendant then was arrested in relation to an incident where he attempted to run someone over (PSR ¶277).  As police tried to intervene, the Defendant sped off, and when he later apprehended, he struck the officers (PSR ¶277).

The next incident in February 2022, involved police responding to a domestic violence incident

where it was reported that the Defendant struck his girlfriend in the face with a firearm (PSR ¶278). The officers found the Defendant and ordered him out of the vehicle – he took off and fled from the officers at an extremely high speed (PSR ¶278).

The Defendant was also charged in February 2023, with another domestic violence incident. In this incident, officers were dispatched because of a report from the victim's father that the Defendant beat up his daughter and left the home (PSR ¶282). The victim reported that the Defendant punched her in the face several times and bent her fingers back when she tried to call for help (PSR ¶282). This case remains pending.

Lastly, and most significantly, the Defendant was charged with a December 31, 2022, murder that took place outside of a nightclub in Springfield, MA (PSR ¶283). This incident took place during the height of the catalytic converter thefts, while a court-authorized GPS tracking device was on the Maroon ACURA MDX. The Defendant is charged with using a firearm that matches one he is pictured holding above to shoot the victim. Following the incident, the Defendant took the Maroon ACURA MDX and stayed in a hotel in North Springfield for a number of days, and the conspirators had to utilize another vehicle for a couple nights of theft. The GPS device showed it parked there for days, while text messages from the Defendant's phones revealed he arranged for video games and food to be delivered to the hotel.

All of the Defendant's court involvement resounds with the similar refrain of excuse, mitigation and leniency. What perhaps was an initial attempt to permit reform and redemption in the juvenile case where he strangled and kicked his girlfriend in the face, has clearly skewed the Defendant's sense of what is acceptable conduct. This measure of leniency was followed by more leniency and clearly has born further crimes, including additional incidents where he physically hurts his girlfriends, family, police and others. These past experiences of repeatedly receiving probation and CWOFs for incidents of serious domestic violence offenses and assault upon police have only emboldened the Defendant. His record reveals the results: he has graduated from domestic violence, and assaults upon police to theft, and now murder charges.

From this, the Court can see the need to advance the goals of specific deterrence through an incarcerated sentence of 57 months. The Defendant's trajectory is one in which past leniency was exploited

18

and opportunities to reorient his life were squandered.  Those sentencing decisions in past cases did little in terms of curtailing the Defendant's behavior, and the results were many more victims of the Defendant – and they can be measured in terms of the 42 catalytic converter theft victims charged here, the domestic violence victims who suffered at his hands, and the murder victim who was killed as a result of the Defendant's use of the firearm pictured above.  Had he been specifically deterred before in his past cases, he may not have found himself in these circumstances. Consequently, specific deterrence now, for these offenses, is all the more important.

Similarly, just punishment must also entail consideration of the sophisticated, coordinated and systematic targeting of catalytic converters by an essentially professional crew of thieves. The government requests this Court impose a serious sentence that reflects the seriousness of the Defendant's crimes, and one that is cognizant of the fact that this Defendant will not be deterred except by incarceration.  A sentence of 57 months properly reflected the Defendant's wayward criminal history, will specifically deter him in a manner that lesser alternatives have failed to do in the past, and will justly punish him for the dozens of victims he accrued in this case.

### D.   General Deterrence, Promotion of Respect for the Law, and Public Protection

General deterrence and promotion of respect for the law must also be considered, and this Court should be extremely mindful of the message that the sentence will send to other catalytic converter thieves, and those would-be thieves.  To that end, this Court must ensure that a message of general deterrence will be sent by the sentences imposed in this case.

It is clear from the statistical decline described above that other criminals and thieves are watching this case, and have properly taken the hint to stay away from Massachusetts.  This Defendant and the overall conspiracy are well known to other offenders, and the case made national news. The government suggests that it has played its role in sending a simple message: federal law enforcement will investigate you, fully identify all your crimes, and aggressively prosecute all of your crimes to the fullest extent of the law in order to ensure separation from society.

However, true deterrence and respect for the law are not messages that are sent through arrests and

pretrial detention, which are but temporary measures.  Rather, the understanding of the type of sentence and penalty that one can expect for these crimes is the heart of deterrence under the sentencing factors and must inform this Court's sentence.  See Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800 (1974) ("An important function of the corrections system is the deterrence of crime. The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses.").  Moreover, general deterrence and its impact must weigh heavily in this case, where the Court's sentence will be imposed in the only catalytic converter case brought in this District, there are few other cases around the country of this scope and extent, and where no prevailing sense (such as those engendered by a mandatory minimum sentence for example) would otherwise inform criminals about what the penalties are for such crimes. Consequently, the context of this case and the nature of the crimes demonstrates that the need for general deterrence is particularly strong where there are essentially no other opportunities to ensure that the goal of general deterrence is served for this type of crime.

This sentence and the sequence of federal involvement in this case will serve as an example and warning to others, or an invitation. In the government's estimation, a very strong message of general deterrence is sent by a 57-month sentence.  Other criminals will understand that their thefts of catalytic converters will find them arrested and in Court, potentially facing a federal case, and multiple years in a federal prison.  They will understand that stealing from others on this scale is extremely serious, and will not be met with leniency or disinterest – certainly not by law enforcement and not by the Court.  While a lengthy sentence may not prevent all forms of catalytic converter theft from returning, a serious 57-month sentence will ensure that the gains made by law enforcement and federal intervention in this area of crime do not quickly erode once the results of this case are shared.

This sentence of 57-months for a first-time felon will also protect the public from the violent potential of the Defendant. This is a sentence that will remove him from society and justly punish him for the wave of thefts and violent crime he has committed, and the drugs and firearms he is responsible for.  A sentence of 57-months imprisonment will also be the best means for the Court can protect the public

generally and ensure that their vehicles and property will not be targeted for the foreseeable future.  Public protection will be well-served by the government's recommendation – it will be accomplished through the Defendant's incarceration and specifically deterring him from these crimes in the future, and a roughly 6-year sentence will deter others from committing similar crimes as well.

Lastly, the swiftly imposed 57-month sentence -- given the Defendant's prompt acceptance of responsibility, and willingness to plead guilty without any litigation -- certainly promotes respect for the law. And such a sentence will also promote respect for the law among those victimized by these crimes and will let the public know that the law and Courts will not excuse the targeting of dozens of victims across this state.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 57 months, followed by three years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY,
Acting United States Attorney

By:    */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:    March 9, 2024