UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NICOLAS DAVILA,<br><br>Defendant | Criminal No. 23-cr-10127-LTS |

**GOVERNMENT'S OBJECTIONS TO PRESENTENCE REPORT**

The government hereby submits its objections to the Presentence Report ("PSR") issued by Probation on March 5, 2024.

**STANDARD OF REVIEW**

"The government bears the burden of proving a sentencing enhancement by a preponderance of the evidence." United States v. Newton, 972 F.3d 18, 20 (1st Cir. 2020). "It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence, and a district court may base its determinations on 'any evidence that it reasonably finds to be reliable.'" United States v. Lacouture, 835 F.3d 187, 189–90 (1st Cir. 2016) (quoting United States v. Almeida, 748 F.3d 41, 53 (1st Cir. 2014)).

**I.  THE GOVERNMENT HAS PROVEN THE +2 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2B1.1(B)(16)(B) BECAUSE THE OFFENSE INVOLVED "POSSESSION OF A DANGEROUS WEAPON (INCLUDING A FIREARM) IN CONNECTION WITH THE OFFENSE."**

   **A.   OBJECTIONS**

The government objects to the PSR not finding that the Offense Level for Group One is increased by 2 for the possession of the firearm "in connection" with the charged offenses under USSG § 2B1.1(B)(16)(B). See PSR ¶¶252-259.

   **B.   GOVERNING LAW**

The application notes specify that § 2K2.1(b)(6)(B) applies "if the firearm ... facilitated, or had the potential of facilitating, another felony offense." cmt. n.14.  The First Circuit has "given the phrase 'in

1

connection with' its plain and broad meaning." United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011). In short, the gun must "'somehow aid or facilitate, or have the potential to aid or facilitate, the commission of [the] offense." United States v. Matthews, 749F.3d 99, 105 (1st Cir. 2014) (cleaned up).  Simply put, satisfying the 'in connection with' requirement 'is not especially burdensome. See United States v. Mitchell, 78 F.4th 661, 671 (4th Cir. 2023).

To that end, the phrase "in connection with" "neither requires 'actual use of the weapon during commission of the [offense] or physical proximity between the weapon and the contraband.'" Matthews, 749 F.3d at 105. Indeed, "a defendant need not use the dangerous weapon in a threatening manner in order for Section 2B1.1(b)(16)(B) to apply." United States v. Wen, 2023 WL 3495820, *1 (9th Cir. May 17, 2023). Rather, as the First Circuit has "previously held, '[t]he key question is whether a sufficient nexus exists between the weapon and the [offense]. If a firearm somehow aids or facilitates, or has the potential to aid or facilitate, the commission of [the theft] offense.'" Paneto, 661 F.3d at 717. "The plain and commonly understood meaning of 'facilitate' is to make easier." United States v. Marrufo, 661 F.3d 1204, 1207 (10th Cir. 2011).

Case law provides various examples of how a firearm can facilitate a theft offense, including:

- **Securing the tools used in the offense from theft**; United States v. Bjerke, 774 Fed. Appx. 319, 323-324 (8th Cir. 2018) ("On this record, it is reasonable to conclude that the possession of the firearm—even if found within his home—emboldened Bjerke to acquire and maintain possession of collocated burglary tools.");

- **Securing the stolen property**; United States v. Basnett, 735 F.3d 1255, 1262 (10th Cir. 2013) ("The court could legitimately have inferred that Mr. Basnett needed to keep the guns to secure his stolen property."); United States v. Gattis, 877 F.3d 150, 161 (4th Cir. 2017) ("the handgun that he was carrying at the time of his January 12 arrest clearly 'had the potential of facilitating' the ongoing conspiracy by serving as a potential means of protecting the stolen goods."); United States v. Ross, 837 Fed. Appx. 617, 628-629 (10th Cir. 2020) ("The considerable amount of stolen merchandise on Mr. Ross's property provided a plausible factual basis for the court to find that the simultaneous presence of the firearms had the potential to facilitate Mr. Ross's stolen-property offense.")

- *Emboldening the Defendant or conspirators engage in the theft offense*; United States v. Cannon, 589 F.3d 514 (1st Cir.2009) (emboldening the enterprise); United States v. Bjerke, 774 Fed. Appx. 319, 323-324 (8th Cir. 2018); United States v. Justice, 679 F.3d 1251, 1255 (10th Cir. 2012) (collecting cases recognizing emboldenment theory);

2

- ***Intimidating those who would retake stolen property***; United States v. Sanchez, 22 F.4th 940, 942 (10th Cir. 2022) (affirming enhancement because defendant "could have carried gun to intimidate anyone who sought to interfere with his possession" of a stolen vehicle).

Numerous Court have found the colocation of firearms, stolen property and implements of the theft crimes to be sufficient for the firearm to be possessed "in connection" with the charged theft counts and conspiracies based on the firearms ability to embolden the offender, protect the ongoing conspiracy, and safeguard the stolen property. The government offers the following exemplary cases:

- United States v. Bjerke, 774 Fed. Appx. 319, 323-324 (8th Cir. 2018) ("On this record, it is reasonable to conclude that the possession of the firearm—even if found within his home—emboldened Bjerke to acquire and maintain possession of collocated burglary tools.");

- United States v. Agor, No. CR 21-00136 HG-01, 2023 WL 8780649, at *5 (D. Haw. Dec. 19, 2023) ("Defendant Agor possessed the firearm and the two knives in connection with the bank theft crime. Defendant Agor possessed the weapons to protect the proceeds that he stole and to avoid detection and responsibility for the offense.").

- United States v. Gattis, 877 F.3d 150, 161 (4th Cir. 2017) ("Specifically, in addition to the evidence just noted, the record indicates that when police searched Watson's residence and property on January 13, 2016, they recovered thousands of dollars worth of items that had been stolen during at least six different burglaries in four different counties between November 13, 2015, and January 7, 2016. The record thus showed sufficiently both that Gattis had committed at least one other felony offense—namely, an ongoing felony conspiracy—and that he possessed a firearm 'in connection' with that felony offense, as the handgun that he was carrying at the time of his January 12 arrest clearly 'had the potential of facilitating' the ongoing conspiracy by serving as a potential means of protecting the stolen goods.");

- United States v. Rogers, 594 F.3d 517, 522 (6th Cir.2010) (upholding application of the enhancement because the defendant's possession of a gun at his home had the potential to facilitate his unlawful "chop-shop," because "chop-shop customers are by definition not law-abiding" and the defendant could not call the police if a customer decided to steal his parts), vacated on other grounds, 131 S. Ct. 3018, 180 L.Ed.2d 842 (2011) (mem.);

- United States v. Valenzuela, 495 F.3d 1127, 1135 (9th Cir. 2007) (explaining that where defendant had a firearm under his seat, the firearm could have reasonably emboldened his possession of stolen property).

- United States v. Maxey-Vasquez, 2022 WL 3715869, at *2-3 (D. Nm. 2022) (upholding enhancement where Defendant was charged with receipt of stolen goods while a firearm was in the vicinity, and the court found that the firearm "had the potential to facilitate receipt of the stolen [goods]" as it might "embolden him to retain possession" if confronted by law enforcement.)

- United States v. Walters, 269 F.3d 1207, 1219 (10th Cir. 2001) (affirming enhancement where District Court found "possessing the gun had 'the potential to facilitate' the offense of keeping the stolen truck because it "emboldened" Walters to maintain possession of the truck 'vis-a-vis Mr. Center or anyone else for that matter.'").

- Ervin v. United States, 2014 WL 856526, at *3 (W.D.Mo. 2014) ("[the defendant] pled guilty to possessing three firearms and the searches of her home revealed several stolen items. From this, it is plausible that the possession of the firearms had the potential of facilitating her dealing in stolen property, and, accordingly, the four-level enhancement was warranted in this case.").

- United States v. Routon, 25 F.3d 815, 819 (9th Cir. 1994) (upholding enhancement where Defendant kept gun in stolen car; "Routon's gun emboldened him to maintain unlawful possession of the Cadillac")

- United States v. Sanchez, 22 F.4th 940, 942 (10th Cir. 2022) (affirming enhancement because defendant "could have carried gun to intimidate anyone who sought to interfere with his possession" of a stolen vehicle).

- Pridgette v. United States, 2020 WL 7081578, at *3 n.2 (D.Id. 2020) (noting that enhancement was properly applied for "multiple felonies—possession of a counterfeit access device and possession of a counterfeit access device making equipment under 18 U.S.C. § 1029(a)(3)–(4), (c), and transportation of a stolen vehicle under 18 U.S.C. § 2312.")

- Compare United States v. Tirado-Nieves, 982 F.3d 1, 3 (1st Cir. 2020) (upholding enhancement under 2K2.1(b)(6)(B) because "[t]he firearms were found in close proximity to drugs, drug manufacturing materials, and drug paraphernalia" and "the presence of the firearm[s] has the potential of facilitating another felony offense, which in this case is drug trafficking")

**C.   ARGUMENT**

The firearm in this case was possessed in connection with the charged theft offenses, which satisfies USSG § 2B1.1(b)(16)(B). See PSR ¶¶218-223. The firearm protected the property stolen during the theft conspiracy, secured the tools used during the theft conspiracy, and emboldened the conspirators and the Defendant. The firearm was found in the Defendant's residence, where property stolen during the conspiracy (including snow blowers), and the very tools used in the catalytic converter thefts, including tools and sawzall blades were also stored.

This alone is sufficient to demonstrate that the firearm was possessed in connection with the theft charges. "From the volume of stolen property, gun[], and ammunition … the sentencing judge could reasonably infer that that [the Defendant] kept the guns in connection with his transportation of stolen

4

property." United States v. Basnett, 735 F.3d 1255, 1262 (10th Cir. 2013) ("The court could legitimately have inferred that Mr. Basnett needed to keep the guns to secure his stolen property."); see also United States v. Ross, 837 Fed. Appx. 617, 628-629 (10th Cir. 2020) ("The considerable amount of stolen merchandise on Mr. Ross's property provided a plausible factual basis for the court to find that the simultaneous presence of the firearms had the potential to facilitate Mr. Ross's stolen-property offense.").

**II.     THE GOVERNMENT HAS PROVEN THE +2 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2B1.1(B)(16)(B) BECAUSE THE OFFENSE INVOLVED "POSSESSION OF A DANGEROUS WEAPON" "IN CONNECTION WITH THE OFFENSE" APART FROM THE FIREARM**

**A.     OBJECTION**

The government further objects to Probation's failure to find that the Offense Level for Group One is increased by 2 for the possession of the other dangerous weapons (beside the firearm), including the reciprocating saws "in connection" with the charged offenses under USSG § 2B1.1(b)(16)(B).

**B.     GOVERNING LAW**

The specific offense characteristic found in USSG § 2B1.1(b)(16)(B), calls for a two-point increase, "if the offense involved … (B) possession of a dangerous weapon (including a firearm) in connection with the offense." The term "'Dangerous weapon' means (i) an instrument capable of inflicting death or serious bodily injury." USSG § 1B1.1, cmt. n.1(E), Therefore, the offense characteristic should be applied when the "offense involved possession" of "an instrument capable of inflicting death or serious bodily injury" "in connection with the offense."

Importantly, "a defendant need not use the dangerous weapon in a threatening manner in order for Section 2B1.1(b)(16)(B) to apply." United States v. Wen, 2023 WL 3495820, *1 (9th Cir. May 17, 2023) (unpublished, cited pursuant to Fed. R. Crim. P. 32.1; Ninth Circuit Rule 36-3(b)); United States v. Walker, 89 F.4th 173, 182-183 (1st Cir. 2023). The case of United State v. Wen is instructive.

In Wen, the Ninth Circuit concluded that a "car, hammer, box cutter, and rope are all self-evidently instruments *capable* of inflicting death or serious bodily injury, so the district court did not err in concluding that they constituted dangerous weapons within the meaning of § 2B1.1(b)(16)(B)." Id. (emphasis added).

5

In Wen, the defendant argued that "those items could not have constituted dangerous weapons under § 2B1.1(b)(16)(B) because he did not actually *use* them in a threatening manner." Id. The Court rejected that interpretation, holding that "[n]either [the definition of dangerous weapon under USSG § 1B1.1 cmt. n.1(E),] nor U.S.S.G. § 2B1.1(b)(16)(B) itself requires actual use of the items to inflict serious bodily injury. The car, hammer, box cutter, and rope are all self-evidently instruments *capable* of inflicting death or serious bodily injury." Id. at *1 (citations omitted, emphasis added).

Similarly, in Wen the defendant utilized those tools and the vehicle during the commission of the offense, which was the damage to property owned by a foreign government. There, the defendant claimed that the government had to prove "that he *used* the items in his possession to inflict serious bodily injury" in order for § 2B1.1(b)(16)(B) to be proven. Id. The Ninth Circuit rejected that argument and held that the items that the instruments capable of inflicting death or serious bodily injury did not need to be used as weapons during the offense. Id. ("This argument depends entirely on the contention we reject above: that the Guidelines requires use of the weapon in the offense."); see also United States v. Agor, No. CR 21-00136 HG-01, 2023 WL 8780649, at *5 (D. Haw. Dec. 19, 2023) (citing Wen, "Contrary to Defendant's position, a defendant need not use the dangerous weapon in a threatening manner in order for Section 2B1.1(b)(16)(B) to apply."). Indeed, the Ninth Circuit concluded that the defendant possessed those dangerous weapons and that they in fact facilitated the offense despite not being used to harm or threaten anyone. Wen, 2023 WL 3495820, at *1-2.

The same logic regarding the definition of dangerous weapon and that the weapon need not be used against a person, or even used during the offense, was also recently discussed in the First Circuit case, United States v. Walker, 89 F.4th 173, 182-183 (1st Cir. 2023). In Walker, the defendant was charged with Hobbs Act robbery conspiracy, and possessed a crowbar, screwdriver, and razor blades in a vehicle, prior the robbery being committed. There, the defendant claimed "the government failed to prove that Walker intended to use the crowbar, screwdriver, and razor blades as weapons" during the anticipated robbery, and that the dangerous weapon enhancement should not, therefore apply. Id. The First Circuit rejected the argument and held that the defendant was "incorrect as a matter of law that the Guidelines require such

6

proof." Walker, 89 F.4th 173 at 182. Rather, the Court held that "the plain meaning of the Guidelines supports the government's view that Walker needed only to 'specifically intend' to 'possess' the items *in connection* with the robbery." Id. at 183 (emphasis added);[1] United States v. Pope, 554 F.3d 240, 246 (2d Cir. 2009) (affirming application of enhancement based on possession of a sledgehammer, observing that a requirement that the defendant must have intended to use the item as a weapon "would directly contradict the plain meaning of this provision of the Guidelines, and would lead to absurd results," including that "a burglar could enter a bank carrying several guns and explosives and remain exempt from the two-level sentencing enhancement so long as those 'tools of the trade' were used only to break open the safes"); United States v. Lavender, 224 F.3d 939, 941 (9th Cir. 2000) (same, based on possession of a screwdriver)..

Consequently, the case law is clear that § 2B1.1(b)(16)(B) only requires that the Defendant possessed "an instrument capable of inflicting death or serious bodily injury" in connection with the charged offense, not that the instrument actually be used to inflict bodily injury during the offense.

C.     ARGUMENT

Apart from the firearm discussed above, the evidence separately has proven that the Defendant possessed reciprocating saws -- "instruments capable of inflicting death or serious bodily injury," USSG 1B1.1, cmt. n.1(E) -- during the thefts of catalytic converters from the vehicles. Under the governing law described above, the reciprocating saws actually used by the Defendant and his conspirators during the charged offenses are "dangerous weapons," even if not used against the person of another or used without an intent to cause physical injury. Consequently, the enhancement under USSG § 2B1.1(b)(16)(B) should also be applied based on the tools and implements that meet the definition of dangerous weapon, which the Defendant and his conspirators used to actually commit the charged offenses.

Here, of course, the reciprocating *saws*, were actually used by the Defendant and his coconspirator to conduct the thefts. This is "self-evidently" an instrument capable of causing serious bodily injury or

---

[1] See United States v. Matthews, 749 F.3d 99, 105 (1st Cir. 2014) *(*the phrase "in connection with" "neither requires 'actual use of the weapon during commission of the [offense] or physical proximity between the weapon and the contraband").

7

death. See Wen, 2023 WL 3495820, at *1-2 ("car, hammer, box cutter, and rope are all self-evidently instruments *capable* of inflicting death or serious bodily injury"); Walker, 89 F.4th at 182-183 (crowbar, screwdriver, and razor blades were dangerous weapons).

Consistent with the clear definition, the reciprocating saws and blades were certainly used in connection with the offense to accomplish the actual thefts.[2] This actual use of the dangerous weapons during the commission of the thefts clearly establishes their possession "in connection with" the offenses in Group One – indeed these implements directly facilitated the thefts. See United States v. Matthews, 749F.3d 99, 105 (1st Cir. 2014) ("in connection with" means "somehow aid or facilitate, or have the potential to aid or facilitate, the commission of [the] offense"). Consequently, the Defendant's use of these instruments capable of causing death or serious bodily injury during the actual theft offenses supports the application of USSG § 2B1.1(b)(16)(B) and the offense level for Group One should be increased by two.

**III. THE GOVERNMENT HAS PROVEN THE +2 INCREASE TO THE OFFENSE LEVEL UNDER USSG § 2B1.1(b)(10)(C) WHERE THE OFFENSE OTHERWISE INVOLVED "SOPHISTICATED MEANS"**

**A. OBJECTION**

The government objects to the PSR not finding that the Offense Level for Group One is increased by 2, where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2K2.1(B)(10)(C).

**B. GOVERNING LAW**

Under USSG §2B1.1(b)(10)(C), the offense level is increased by 2 levels if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." USSG § 2B1.1(b)(10)(C). "Sophisticated means need not be highly sophisticated. The application of [t]he sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." United States v. Norwood,

---

[2] Indeed, if these "dangerous weapons" needed to be used against another person, the crimes would necessarily be a robbery, and an entirely different guideline would always be at issue. This would essentially eliminate the guidelines from ever applying.

774 F.3d 476, 480 (8th Cir. 2014) (per curiam) (alterations in original) (internal quotation marks omitted)

The commentary to the guidelines defines "sophisticated means" and provides an exemplary list of conduct that satisfies the definition:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1 cmt. n.9(B). "The enumerated examples are by no means exhaustive, and as other circuits have recognized, 'the enhancement properly applies to conduct less sophisticated' than the examples." United States v. Foley, 783 F.3d 7, 25 (1st Cir. 2015), quoting United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir.2013) (collecting cases). Moreover, a "scheme may be sophisticated even if the individual elements taken alone are not." United States v. Evano, 553 F.3d 109, 113 (1st Cir.2009); Foley, 783 F.3d at 25. In short, the "defendant need not have done any of the things listed in order to qualify for the enhancement, so long as the offense as a whole shows 'a greater level of planning or concealment' than a typical [theft] of its kind.'" United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015).

Indeed, "[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." United States v. Garbacz, 33 F.4th 459, 474 (8th Cir. 2022). "Overall, the sophistication of the offense conduct is associated with the means of repetition, the coordination required to carry out the repeated conduct, and the number of repetitions or length of time over which the scheme took place." United States v. Meadows, 866 F.3d 913, 917-18 (8th Cir. 2017). In short, if the steps taken by the conspiracy "make their scheme more effective and difficult to thwart," that "it is enough to justify the enhancement." Evano, 553 F.3d at 113; see United States v. Davis, 753 F. App'x 154, 157 (4th Cir. 2018) (sophisticated means where the 'total scheme' was also 'sophisticated in the way all the steps were linked together'").

Lastly, "[t]he sophisticated-means enhancement is appropriate when 'the defendant intentionally engaged in or caused the conduct constituting sophisticated means.' Nothing in this language limits

9

application of the enhancement to only the mastermind of the scheme." United States v. Muresanu, 951 F.3d 833, 840 (7th Cir. 2020) (citation omitted). Consequently, the offense level should be increased even if the Defendant does not serve in an aggravating role, if his participation in the scheme entailed knowledge and understanding that these sophisticated elements were present.

### C. ARGUMENT

The offense here clearly involved sophisticated means. In this case, the efforts of the Defendants to plan, execute, and conceal the scheme were extremely effective, and facilitated nearly 500 individual thefts on nearly 100 separate nights for over a year. This scheme was difficult to thwart and required the coordination of over 70 law enforcement agencies across three jurisdictions and federal involvement.

As noted above, the individual components of the scheme need not be sophisticated if the overall scheme was sophisticated in its totality. See Evano, 553 F.3d at 113. The government offers a bullet point list of exemplary criteria that demonstrate, the "level of planning or concealment,'" Pacheco-Martinez, 791 F.3d at 179, that the offenses involved.:

- The Defendants used an anonymized vehicle well-suited and dedicated to the theft of catalytic converters. See PSR 17-25, 28-30. The conspiracy also had the ability to employ additional vehicles for logistical aspects of the thefts. See PSR 75.

- They employed anonymized license plates, and stole license plates to obscure the frequent use, ownership and common identity of the vehicle. See United States v. Finley, 600 Fed. Appx. 964, 967 (6th Cir. 2015) (listing criteria for sophisticated means and noting conspirators "switched license plates"). See PSR 66-68.

- The conspiracy took place over a period of months and repeatedly committed hundreds of thefts, frequently conducting thefts multiple times per week. See United States v. Garbacz, 33 F.4th 459, 474 (8th Cir. 2022) ("[r]epetitive and coordinated conduct"); United States v. Ouedraogo, 824 F. App'x 714, 724 (11th Cir. 2020) ("repetitive and lengthy course of conduct"). The Defendant was specifically apprised by R. DAVILA of the scope of the conspiracy. See PSR 73-74.

- The conspiracy involved multiple jurisdictions, with thefts across virtually every county in Massachusetts, New Hampshire, and Connecticut. The thefts were spread across jurisdictions to avoid police interdiction and reduce the potential for coordinated investigation. See United States v. Shifu Lin, 508 Fed. Appx. 398, 403 (6th Cir. 2012) (sophisticated means based on "cross-jurisdictional conduct and technical knowledge necessary to commit the offense").

- The thefts were well-planned over the internet to target dozens of vehicles in a single, identifying the specific makes and models used by certain businesses over the internet, and

10

targeting them at scale. See United States v. Jackson, 346 F.3d 22, 23–25 (2d Cir.2003) (upholding sophisticated means enhancement where defendant used internet to identify targets); United States v. Ghertler, 605 F.3d 1256, 1268 (11th Cir. 2010) (finding sophisticated means where defendant had to "conduct extensive research on the victim companies"). Those specific vehicles were targeted based on the prices set by the digital pricing application that was subscriber based. The thefts entailed hundreds of miles of driving per night to strike the most number of valuable vehicles in a single night. See United States v. Clarke, 562 F.3d 1158, 1166 (11th Cir.2009) (noting in approving a "sophisticated means" determination that the scheme "covered a three-year period and required intricate planning").

- Logistics were handled by the leader, R. DAVILA, who charged the batteries, paid for the gas, did "homework" to plan the routes, stored the stolen property, bought snacks, paid for the pricing application, and noted the number and prices of catalytic converters. See PSR 29-32, 74.

- The thieves employed specialized knowledge of automobiles such as knowing where the catalytic converters were located in the darkness of night and skillfully using the sawzalls and tools to cut them out of the vehicles within seconds. See United States v. Dawson, 588 F. App'x 890, 894 (11th Cir. 2014) (sophisticated means where "conduct involved numerous steps, affected multiple victims, spanned several years, and required specialized knowledge"); United States v. Stafford, 639 F.3d 270, 276 (6th Cir. 2011) (citing defendant's misuse of specialized knowledge in support of affirming the application of sophisticated means enhancement); Hopkinson v. United States, No. 10 CR 538, 2017 WL 5891262, at *6 (N.D. Ill. Nov. 29, 2017) ("specialized knowledge"); United States v. Rettenberger, 344 F.3d 702, 709 (7th Cir. 2003) (affirming a finding of sophisticated means where the appellant engaged in "[c]areful execution and coordination over an extended period." (alteration in original)).

- Torres, the regular fence for the catalytic converters, and charged coconspirator, created a "corporate shell" – Scrapguys413 LLC – to facilitate the transactions with the core buyers. See PSR 37-42; USSG § 2B1.1 cmt. n.9(B) ("Conduct such as … the use of fictitious entities, corporate shells … also ordinarily indicates sophisticated means."). The use of Torres and efforts to best monetize the stolen converters was also specifically discussed with N. DAVILA by R. DAVILA. See e.g., PSR ¶74.

- They employed a storage unit to store the stolen goods. See United States v. Balde, 616 F. App'x 578, 584 (4th Cir. 2015) (Finding sophisticated means where "merchandise purchased with the re-encoded cards was first kept in a storage unit and then sent to New York for sale.").

This list of criteria provided by the government is by no means exhaustive. However, even one or two of these distinctive circumstances, techniques and disciplined actions demonstrates "a greater level of planning or concealment than a typical [theft scheme] of its kind." United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015).

The Defendant participated in about 10% of the conspiracy's charged thefts over a short window

11

of three nights. While participating in only a few nights of theft, he was able to steal converters from 42 vehicles and demonstrated sufficient skill and efficiency that R. DAVILA planned on his continued participation in the conspiracy twice a week. The Defendant was knowledgeable as to the conspiracy's sophistication and the manner in which it accessed the larger marketplace through Torres.  He communicated with R. DAVILA concerning using other fences and obtaining additional anonymized license plates for use during the theft nights. Nicolas DAVILA and Rafael DAVILA also spoke about financial discipline with the proceeds and planning for future thefts based on the successful system they were executing. In short, all the component parts of this conspiracy, considered together, readily satisfy the sophisticated means requirement, and the Defendant was very familiar with these elements of this conspiracy's planning, execution and concealment.

## CONCLUSION

Based upon the foregoing, the government requests that the Court sustain the government's objections and order the PSR be amended as follows:

- the Offense Level for Group One is increased by 2 under USSG § 2B1.1(b)(16)(B)
- the Offense Level for Group One is increased by 2 under USSG § 2B1.1(b)(16)(B)),
- the Adjusted Offense Level for Group One should be 24.
- after reducing the offense level by 3 for acceptance of responsibility, the Total Offense Level should be 21.

Respectfully submitted,

JOSHUA S. LEVY,
Acting United States Attorney

By:   */s/ Philip A. Mallard*
    PHILIP A. MALLARD
    Assistant U.S. Attorney
    United States Attorney's Office
    1 Courthouse Way, Suite 9200
    Boston MA 02210
    617-748-3674

CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                          */s/ Philip A. Mallard*
                                          PHILIP A. MALLARD
                                          Assistant U.S. Attorney

Date:   March 9, 2024